UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Albert S.,

      Plaintiff,

      v.                                Civil Action No. 2:18–cv–21–jmc

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 15, 17)

Plaintiff Albert S. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 15), and the Commissioner's motion to affirm the same (Doc. 17). For the reasons stated below, Plaintiff's motion is DENIED; the Commissioner's motion is GRANTED; and the Commissioner's decision is AFFIRMED.

## Background

Plaintiff was 39 years old on his alleged disability onset date of December 10, 2011. He completed school through the eleventh grade, and has worked as a delivery truck driver, a folding machine operator, and a construction worker. He lives with his wife of over ten years and has no children.

Plaintiff stopped working in around December 2011, after injuring his back while on the job. (*See* AR 18, 355, 362.) Despite undergoing surgery in March 2012 (AR 370), Plaintiff continues to suffer from chronic back pain (AR 92, 100–01). At the administrative hearing, Plaintiff testified that this pain is sometimes constant, sometimes intermittent; and it prevents him from doing any physical activity including sitting, standing, and walking; and it negatively affects his sleep. (AR 92, 96–97, 102.) Plaintiff takes methadone, Percocet, and ibuprofen, among other medications, to alleviate his pain, but these medications cause him to be tired and "foggy." (AR 93.)

In addition to his back pain, Plaintiff has been diagnosed with several mental health impairments, including depression, anxiety, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), obsessive-compulsive disorder (OCD), and explosive disorder. (AR 15, 18, 93–94.) He suffers from night terrors, and never sleeps for longer than three hours at a time. (AR 102–03.) Plaintiff takes Adderall for his ADHD but does not take any medication for his depression or anxiety because when he has in the past, the medication either did not alleviate his symptoms or resulted in too many unpleasant side effects. (AR 99.) Plaintiff's medical providers have been careful about what types and levels of medications to prescribe Plaintiff because he has had problems with alcohol and cocaine use in the past. (AR 541.) He stopped drinking alcohol in around 2006 (*id.*; *but see* AR 474 (quit alcohol in 2004), 481 (quit alcohol in 2009), 782 (quit alcohol in 2008)), and stopped using cocaine in around 2000 (AR 481).

Plaintiff testified that he does not like people; he has no friends; and he does not get along with his relatives including his father. (AR 94–95, 105.) He stated that he becomes nervous and tense around crowds, preferring to avoid them. (AR 106.) On a typical day, Plaintiff watches around eight hours of television, plays video games for approximately 30 minutes, takes his dog for a walk around the block with his wife, and prepares simple meals like microwavable soup. (AR 103–05.)

In February 2015, Plaintiff filed applications for DIB and SSI. (AR 11, 244–45.) In his disability application, Plaintiff alleges that, starting on December 10, 2011, he has been unable to work due to a back injury (ruptured disc), episodic mood disorder, depression, and PTSD. (AR 263.) In a March 2015 Function Report, Plaintiff explained that, before his work injury, he was physically active and strong, but since then, he "struggle[s] to get through each and every day." (AR 281.) He further stated that he has "a long history of mental illness that has become much worse" in the few years prior to 2015. (*Id.*) In an April 2015 Function Report, Plaintiff stated that he forgets simple things, sometimes fails to finish projects, has a difficult time focusing on a task without getting distracted, has trouble following directions, and does not like being told what to do. (AR 300.)

Plaintiff's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. A hearing was conducted on June 14, 2016 by Administrative Law Judge (ALJ) Matthew Levin. (AR 87–119.) Plaintiff appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified. On August 4, 2016, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from his alleged disability

onset date of December 10, 2011 through the date of the decision.  (AR 11–30.)
Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the
ALJ's decision the final decision of the Commissioner.  (AR 1–6.)  Having exhausted
his administrative remedies, Plaintiff filed the Complaint in this action on
January 30, 2018.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability
claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step
requires the ALJ to determine whether the claimant is presently engaging in
"substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is
not so engaged, step two requires the ALJ to determine whether the claimant has a
"severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the
claimant has a severe impairment, the third step requires the ALJ to make a
determination as to whether that impairment "meets or equals" an impairment listed
in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§
404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her
impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582,
584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine
the claimant's residual functional capacity (RFC), which means the most the
claimant can still do despite his or her mental and physical limitations based on all
the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e),
404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to

consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that, although Plaintiff had earned income after his alleged disability onset date of December 10, 2011, he had not engaged in substantial gainful activity. (AR 13.) At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, depression, and anxiety. (*Id*.) Conversely, the ALJ found that Plaintiff's post-concussive syndrome and obesity were non-severe. (AR 14.) At step three, the ALJ found that none of Plaintiff's physical or mental impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–17.)

Next, the ALJ determined that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Plaintiff] can sit for 8 hours, stand for 1 hour, and walk for 1 hour, with an allowance to change positions as needed; he can frequently perform overhead reaching and lateral reaching, bilaterally, with no manipulative limitations; he can frequently push or pull with the lower left extremity; he can tolerate occasional exposure to heights, wetness, temperature

extremes, and vibrations; he can occasionally climb ramps and stairs, balance, and crouch; he must avoid using ladders and stooping; he is limited to performing simple, 1- to 3-step tasks in a low production setting; he is able to maintain his attention and concentration for 2-hour increments throughout an 8-hour workday/40-hour workweek; and he must avoid intense or frequent social interaction with the public, coworkers, and supervisors.

(AR 17.) Given this RFC, the ALJ found that Plaintiff was unable to perform his past relevant work as a delivery truck driver, a folding machine operator, and a construction worker. (AR 28.) Finally, based on testimony from the VE, the ALJ determined that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as the representative occupations of inspector/hand packager, document preparer, and addressing clerk. (AR 29–30.) The ALJ concluded that Plaintiff had not been under a disability from the alleged onset date of December 10, 2011, through the date of the decision. (AR 30.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff contends that the ALJ erred in his consideration of Plaintiff's ADHD at step two of the sequential evaluation, and in his valuation and analysis of the medical opinions. In response, the Commissioner asserts that the ALJ properly considered Plaintiff's ADHD throughout the decision, and that the ALJ's analysis of the medical opinions is supported by substantial evidence and complies with the

applicable legal standards.  The Court finds in favor of the Commissioner for the reasons explained below.

## I.    ALJ's Failure to Consider Whether ADHD Was a Severe Impairment

Plaintiff argues that the ALJ should have evaluated whether ADHD was a severe impairment at step two of the sequential analysis, noting that the ALJ's only reference to the impairment was the finding that ADHD had been listed as a rule out diagnosis in 2013.  (Doc. 15-2 at 2–5.)  Plaintiff points to records from mental health professionals who diagnosed and treated Plaintiff for ADHD beginning in 2010.  (*Id.* at 3 (citing AR 473, 475, 481–82, 502, 526, 535, 542).)  The Commissioner asserts that the ALJ found other severe impairments at step two and considered Plaintiff's ADHD beyond that step; thus any step-two error in failing to find that Plaintiff's ADHD was a severe impairment was harmless.  (Doc. 17 at 11.)  The Court agrees with the Commissioner.

It is the claimant's burden to show at step two that he has a "severe impairment," meaning an impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").  An impairment is "not severe" when medical evidence establishes "only a slight abnormality . . . [,] which would have no more than a minimal effect on [the claimant's] ability to work."  SSR 85-28, 1985 WL 56856, at *3 (1985).  Importantly, the omission of an impairment at step two does not in and of itself require remand and may be deemed harmless error.  *See Zabala v.*

*Astrue*, 595 F.3d 402, 409–10 (2d Cir. 2010) (finding harmless error when impairments are considered at subsequent steps of sequential evaluation); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."); *see also Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (applying harmless error standard in social security context, and holding that, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration"). This is particularly true where the disability analysis continued and the ALJ considered all of the claimant's impairments in combination in his RFC determination. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding any step-two error harmless because ALJ "specifically considered" impairments at subsequent steps of evaluation); *Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d Cir. 2010) (finding no error where ALJ "considered the combination of impairments and the combined effect of all symptoms" (internal quotation marks omitted)); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding any error in failing to list claimant's bursitis at step two harmless because ALJ "extensively discussed" bursitis and "considered any limitations posed by [it] at Step 4").

Here, even if the ALJ erred in failing to find that Plaintiff's ADHD was a severe impairment at step two, the error was harmless, as the ALJ continued the disability analysis past step two and accounted for all of Plaintiff's impairments in

combination in his RFC determination.  Specifically, at step three, the ALJ noted that Plaintiff had been diagnosed with ADHD and cited to a mental RFC report of treating psychologist Abigail Tobias, MA, which diagnosed Plaintiff with ADHD and opined that Plaintiff was significantly limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods.  (AR 15 (citing AR 892).)  Moreover, the ALJ explained in his decision that Plaintiff has "moderate restrictions in his ability to maintain concentration, persistence, and pace," specifically noting Plaintiff's statement in a Function Report that his ability to pay attention is "very limited," and comments in another Function Report that Plaintiff "gets off track easily" and "will start projects and sometimes never finish them."  (AR 16 (internal quotation marks omitted) (citing AR 279, 298, 300).)  The ALJ continued to consider Plaintiff's ADHD in determining his RFC, recognizing that Plaintiff carried diagnoses of ADHD and ADD, somewhat successfully used Adderall to alleviate the symptoms of these disorders, and sometimes reported deficiencies in concentration while at other times reported no deficiencies.  (AR 18, 22–24, 129–30, 144–45, 158–59, 520, 542, 747, 806, 892–93.)  Recognizing that treating psychologist Tobias diagnosed Plaintiff with ADHD, the ALJ stated: "Tobias also indicated that [Plaintiff] cannot maintain his attention and concentration for . . . 15% [or more] of a typical workday[;] [h]owever, [he] watches television all day and he plays video games."  (AR 25; *see* AR 105, 893.)

The ALJ's analysis of Plaintiff's ADHD is legally proper and supported by substantial evidence, and thus the Court finds no grounds to remand based on any error at step two of the sequential evaluation.[1]

## II. ALJ's Analysis of the Medical Opinions

Next, Plaintiff asserts that the ALJ erred in giving little weight to the opinions of treating psychologist Abigail Tobias, MA and great weight to the opinions of nonexamining agency consultants Dr. Howard Goldberg and Dr. Joseph Patalano. (Doc. 15-2 at 5–11.) As explained below, the Court disagrees, and finds that the

---

[1] Plaintiff includes a "Listings" argument as part of his claim that the ALJ did not properly assess his ADHD, asserting that the ALJ erred in failing to consider Listing 12.02, the Listing most relevant to ADHD. (*See* Doc. 15-2 at 2–5.) This argument lacks merit, given that the ALJ thoroughly considered Plaintiff's ADHD throughout his decision, and that consideration is supported by substantial evidence, as discussed above; and Plaintiff has presented no medical evidence demonstrating that Plaintiff met or medically equaled Listing 12.02 during the alleged disability period. *See Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017) ("Although the ALJ did not explicitly discuss Listing 11.14, his general conclusion (that Solis did not meet a listed impairment) is supported by substantial evidence."); *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) ("[T]he absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence."); *see also* SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds by* SSR 91-7c, 1991 WL 231791 (1991) (explaining that a determination that a claimant's impairment or combination of impairments is medically equivalent of a listed impairment "must be based on *medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques*, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary" (emphasis added)); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all of the specified medical criteria* [of that listing]. An impairment that manifests only some of those criteria, no matter how severely, does not qualify" (emphasis added)). The ALJ's explicit consideration of Listings 12.04, 12.06, and 12.08 in his decision does not imply error in his failure to explicitly consider Listing 12.02, especially given the ALJ's express statement that the explicitly considered Listings were mere "example[s]" of potentially applicable listings. (AR 15; *see* AR 16–17.) Listing 12.02 is similar to Listings 12.04, 12.06, and 12.08, and Plaintiff has presented no evidence indicating that he met or medically equaled any of these Listings; moreover, agency consultants Drs. Goldberg and Patalano—whose opinions the ALJ gave great weight—specifically considered Listing 12.02 and found that Plaintiff did not satisfy it. (*See* AR 126, 141.) *See Talavera v. Astrue*, 500 F. App'x 9, 11 (2d Cir. 2012) (ALJ "adequately consider[ed]" claimant's obesity where he relied on opinions from doctors who clearly considered it).

ALJ's analysis of the medical opinions is legally proper and supported by substantial evidence.

## A.    Opinions of Treating Psychologist Tobias

Plaintiff began treating with psychologist Tobias in December 2010. (AR 473.) In an Intake Interview form dated December 13, 2010, Tobias noted that Plaintiff reported feeling "angry all the time," being depressed for the first time in his life, experiencing problems with his memory, and sleeping for only two to three hours at a time. (*Id*.) Tobias diagnosed Plaintiff with depressive disorder (AR 474), and stated: "[Plaintiff] is currently struggling with depression and difficulty managing his anger. He has had multiple losses within the last year and has conflictual relationships with his remaining family members." (AR 475.) On February 27, 2013, Tobias completed another Intake Interview form, this time recording that Plaintiff stated that, since being injured at work in December 2011, he separated from his wife, was angry all the time, suffered pain, and felt overwhelmed. (AR 471.) Tobias diagnosed Plaintiff with adjustment disorder with mixed anxiety and depression, and noted that Plaintiff "has chronic pain" and "appears quite isolated." (AR 472.)

In January 2016, Tobias completed a Mental RFC Statement regarding Plaintiff's mental impairments, wherein she diagnosed Plaintiff with PTSD and ADHD (AR 892), and opined that Plaintiff is unable to work 40 hours per week (*id*.) due to his inability to perform the following work-related activities for 15% or more of an eight-hour workday: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods of time; working in coordination with or in proximity to others without distraction;

completing a normal workday and workweek without interruptions; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers; and maintaining socially appropriate behavior (AR 893).

The Social Security Act recognizes a rule of deference to the medical views of a physician, psychologist, or other "acceptable medical source," as defined in the regulations, who is engaged in the primary treatment of a claimant. 20 C.F.R. §§ 404.1527(a)(2), (c)(2); 416.927(a)(2), (c)(2)[2]; *see Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). This rule, known as the "treating physician rule," applies to Tobias's opinions, given that the regulations define "acceptable medical source" to include "[l]icensed or certified psychologists," 20 C.F.R. § 404.1513(a)(2); and the Social Security Administration's Program Operations Manual System (POMS) provides that, in Vermont, a medical source going by the designation "M.A., Psychologist"— which Tobias goes by (*see, e.g.*, AR 472, 690–734)—constitutes evidence that the source is a licensed or certified psychologist. POMS DI 22505.004(A)(1)(b), available

---

[2] Effective March 27, 2017, the Social Security Administration published a final rule announcing revisions to the Social Security Act that affect the provisions which govern the Court's decision in this case. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (20 C.F.R. pts. 404, 416); Revisions to Rules Regarding the Evaluation of Medical Evidence, Correction, 82 Fed. Reg. 15132 (Jan. 18, 2017) (20 C.F.R. pts. 404, 416); *see also* Social Security Administration, https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited May 17, 2017). The revisions are intended to: update and simplify the rules affecting social security claims; "reflect[] changes in the national healthcare workforce and in the manner that individuals receive medical care"; and "emphasize[] the need for objective medical evidence in disability and blindness claims." Social Security Administration, *supra*. These new rules do not affect this decision, however, because it relates to a social security claim filed before March 27, 2017. *Id.*; *see Wood v. Colvin*, 987 F. Supp. 2d 180, 194 n.10 (N.D.N.Y. 2013) ("For the purposes of the Court's review, . . . the Court applies the regulations that were in effect at the time [the plaintiff] applied for disability benefits.").

at https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505004 (last visited October 30, 2018).  (*See* AR 24.)

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well[] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (second alteration in original) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (noting that treating sources offer a "unique perspective to the medical evidence" that cannot otherwise be obtained from the record).  Of course, there are circumstances when it is appropriate for an ALJ to give less than controlling weight to a treating source's opinion.  *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("[T]he opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").  In those circumstances, the regulations require the ALJ to explicitly consider several factors before determining how much weight the opinion should receive, including, among others: "(1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight

assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (alteration in original) (quoting *Halloran*, 362 F.3d at 33); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("[The Commissioner] will always give good reasons in [the] . . . decision for the weight . . . give[n] [to the] treating source's medical opinion."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[T]he Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.")).

Here, the ALJ assigned "little weight" to psychologist Tobias's opinions, explaining that, although Tobias specializes in psychology and had a longitudinal treatment relationship with Plaintiff during the relevant period; her opinions are supported merely by Plaintiff's self-reporting rather than by diagnostic testing, and are inconsistent with other substantial evidence in the record, including other medical opinions. (AR 24–25.) As discussed above, these factors—supportability and consistency with the record—were proper factors for the ALJ to consider in assessing the value of Tobias's opinions. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."); *id.* at (c)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that medical opinion."). Moreover, the Second Circuit routinely holds that "subjective symptoms are alone insufficient to support a finding of a disability." *Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016); *see*

*Polynice v. Colvin*, 576 F. App'x 28, 31 (2d Cir. 2014) ("Much of what [the claimant] labels 'medical opinion' was no more than a doctor's recording of [the claimant's] own reports of pain."); *Roma v. Astrue*, 468 F. App'x 16, 19 (2d Cir. 2012) (affirming ALJ decision to give less weight to doctor's opinion because it was "based largely upon [the claimant's] subjective responses"); *Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.").

Most importantly, substantial evidence supports the ALJ's assessment of Tobias's opinions. Specifically, as the ALJ accurately noted, despite Tobias's extreme opinions regarding Plaintiff's inability to interact with others (AR 893), Plaintiff "maintains a relationship with his wife and talks with family members, albeit infrequently, by telephone" (AR 24). *See, e.g.*, AR 297 ("verbally converses everyday with his wife," and "will talk on the phone, rarely, with his family [members]"). The ALJ also correctly noted that, although Plaintiff "was often frustrated" at treatment sessions (AR 24), Tobias's treatment notes indicated that he was at times "quite talkative, calm, upbeat, and thoughtful" (AR 25 (internal quotation marks omitted) (citing AR 649, 756, 887)). In fact, an overall review of the notes from Plaintiff's treatment sessions with Tobias indicates that Plaintiff often began sessions angry or irritated, but left feeling more calm, less angry, and having hope. Regarding Tobias's opinion that Plaintiff could maintain concentration and attention for less than 15% of the day (AR 893), as mentioned above, the ALJ properly stated that Plaintiff has enough concentration and attention to watch television all day and play video games for part of each day (AR 25; *see* AR 105). The ALJ further noted that Tobias

"reported that [Plaintiff] is able to understand, remember, and carry out short, simple instructions," which is consistent with the opinions of agency consultants Drs. Goldberg and Patalano (discussed below).  (AR 25 (citing AR 893); *see* AR 129, 144.)

Not only is the ALJ's finding that Tobias's opinions are inconsistent with the record supported by the opinions of Drs. Goldberg and Patalano; it is also supported by normal findings throughout the record recorded by several treating providers including Tobias.  For example, as the ALJ cited, the record contains findings documented by treating providers Charmaine Patel, MD, and Jessica O'Neil, DO, as well as Tobias herself, that Plaintiff presented as calm, articulate, stable, thoughtful, having good judgment and concentration, doing well, having an improved mood and better ability to control his anger on Adderall, having a fine mood, not feeling depressed, and having normal insight and adequate cognitive functions.  (AR 23–25, 479, 481, 541, 649, 756, 802, 806, 819, 881, 885, 887, 923.)

In addition to considering the factors of supportability and consistency in assessing the value of Tobias's opinions, the ALJ also appropriately noted (AR 23) that Tobias's treatment notes indicated Plaintiff did not fully benefit from treatment in part because he engaged in a "pattern of obfuscation" (AR 756).  (*See* AR 760 ("sometimes seems to hold back or not give full details of what he is talking about"), 763 ("discussed . . . ways in which he may not be helping himself to get the best care possible").)  Moreover, as part of his general consideration of the evidence and assessment of Plaintiff's credibility, the ALJ discussed several instances where Plaintiff failed to seek, engage in, or follow through with mental health treatment;

and cited to multiple treatment notes indicating that Plaintiff abused narcotic pain medication by, for example, taking too many pills or obtaining pills from family members or friends without the permission of his medical providers. (AR 22, 25–26; *see* AR 436 ("doubl[ed] up his prescription" without notifying medical provider), 441 (urine screen showed nonprescribed methadone in blood, said he "may have received [some medication] from his wife," advised about "the importance and implications of taking a non-prescribed controlled medicine and . . . that this makes it very difficult to continue his pain management"), 446 ("he does acknowledge now receiving medication from an acquaintance when he had run out of morphine early"), 471 ("would like to make a change in providers as he feels his doctor has accused him of misusing his pain medications," "[there] is some question of recent misuse of pain medications, which [Plaintiff] denies"), 472 ("his expectations of pain management may not be realistic"), 484 ("tried taking Effexor but stopped it after feeling too tired"), 529 ("picked up the [prescribed] medication but never tried it"), 541 ("admits to . . . using a friend[']s pain medication when he was running out of his medication accident[a]l[l]y"), 621 ("tried taking amit[r]iptyline at a higher dose on his own," "has 'borrowed' some pain medication from friends"), 719 ("while he accepted a prescription[,] he is now reluctant to take the medication"), 780 ("[n]ot regularly adherent to meds, discus[s]ed importance of using regularly"), 785 ("has bought meds off friends in past due to the pain").)

The ALJ's consideration of this evidence, in conjunction with his evaluation of the opinions of Plaintiff's treating providers, including Tobias, was proper because where, as here, a treating provider's opinions are largely based on a claimant's own

18

subjective reporting, it is appropriate to give less weight to those opinions if the claimant has been less than forthcoming at appointments and not fully compliant with treatment recommendations. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013). Furthermore, the Social Security regulations state: "If you do not follow the prescribed treatment without a good reason, we will not find you disabled." 20 C.F.R. §§ 404.1530(b), 416.930(b). And the Social Security Administration has determined that a claimant's statements "may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see* SSR 82-59, 1982 WL 31384, at *2 (1982) ("[C]ontinued failure to follow prescribed treatment without good reason can result in denial or termination of benefits."). Applying these principles, in *Dumas v. Schweiker*, the Second Circuit affirmed the denial of benefits to a claimant who failed to heed his examining physicians' diet recommendations that would have helped his hypertension and headaches. 712 F.2d 1545, 1553 (2d Cir. 1983). Noting that the claimant's physicians "were frustrated by [the claimant's] unwillingness to help himself," the Second Circuit stated: "Of course, a remediable impairment is not disabling." *Id.*; *see also Calabrese v. Astrue*, 358 F. App'x 274, 277–78 (2d Cir. 2009) (in assessing claimant's credibility, ALJ properly considered, among other things, that claimant "took no prescription-strength pain medication despite her contention that she constantly experienced [severe] pain . . . [and] was noncompliant in taking the medication that was prescribed by her doctors"); *Russell v. Barnhart*, 111 F. App'x 26, 27 (1st Cir. 2004) (per curiam) ("A claimant's failure to follow prescribed medical

treatment contradicts subjective complaints of disabling conditions and supports an ALJ's decision to deny benefits."). Applied here, Plaintiff's recognized failure to comply with treatment recommendations and drug-seeking behavior contributes to the substantial evidence that supports the ALJ's finding that Tobias's opinions are deserving of little weight.

## B. Opinions of Agency Consultants Drs. Goldberg and Patalano

In contrast to the "little weight" afforded to the opinions of treating psychologist Tobias (AR 24), the ALJ afforded "great weight" to the opinions of nonexamining agency consultants Drs. Goldberg and Patalano, on the grounds that the latter opinions are consistent with the record (AR 25). Drs. Goldberg and Patalano made their opinions in March 2015 and May 2015, respectively, a little over one year before Tobias made her opinions, opining in part that Plaintiff was limited to performing simple, one- to three-step tasks in a low-production setting; able to maintain attention and concentration for two-hour increments throughout an eight-hour workday; and unable to engage in frequent social interaction with the public, coworkers, and supervisors. (AR 129–130, 144–45, 158–60.)

Plaintiff finds fault with the ALJ's allocation of greater weight to the opinions of Drs. Goldberg and Patalano than to those of Tobias, particularly because the consultant opinions predated "the majority of the mental health records," including Tobias's opinions. (Doc. 15-2 at 10.) But the Second Circuit has consistently found that the opinions of agency consultants may override those of treating physicians, when the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*,

3 F.3d 563, 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). And this is so, even in cases like this, where the consultants have not reviewed the entire record, so long as the consultant opinions are supported by the record and there is no evidence of a new diagnosis or a worsening of the claimant's condition after the consultant opinions were made. *See Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) ("No case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record."); *Charbonneau v. Astrue*, Civil Action No. 2:11–CV–9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012). Though Plaintiff argues that additional evidence was added to the record after Drs. Goldberg and Patalano made their opinions, he presents no evidence demonstrating that Plaintiff had a worsening of his condition in that period.

Substantial evidence—including normal mental health findings recorded by treating providers Dr. Patel, Dr. O'Neil, and Tobias—supports the ALJ's finding that the opinions of Drs. Goldberg and Patalano are consistent with the record. (*See* AR 22–25, 480–81, 542, 650, 757, 796, 806, 813, 877, 887–88.) The ALJ properly cited to this evidence in his decision, along with other non-medical evidence including Plaintiff's reported daily activities and Plaintiff's failure to comply with treatment recommendations, as discussed above. Therefore, the Court finds no error in the ALJ's assessment of the opinions of agency consultants Drs. Goldberg and Patalano.

### III.   ALJ's Consideration of GAF Scores

Finally, Plaintiff contends the ALJ erred by failing to explain what weight he afforded to several Global Assessment of Functioning (GAF)[3] scores assigned to Plaintiff, including Tobias's assignment of a GAF score of 50 (AR 472).  (Doc. 15-2 at 6–7, 9.)  The ALJ did discuss these scores in his decision but did not assign a weight to them.  (*See* AR 22–23.)  This was not error, as an ALJ is not required to expressly discuss every aspect of a treating provider's opinions.  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("[A]n ALJ is not required to discuss every piece of evidence submitted[, and] [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal quotation marks and citation omitted).

Moreover, a low GAF score—in and of itself—does not demonstrate that an impairment significantly interfered with a claimant's ability to work.  *Parker v. Comm'r of Soc. Sec. Admin.*, Civil Action No. 2:10-cv-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score.")).  Rather, a claimant's GAF score is

---

[3] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alteration in original) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM–IV*)).  Under the *DSM–IV*, the Plaintiff's GAF score of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."  Of particular importance here, in 2013, the American Psychiatric Association published the *DSM–5*, which "drop[s]" reference to the GAF "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (*DSM–5*).

only "one factor" to consider in determining his ability to perform substantial gainful activity. *Parker*, 2011 WL 1838981, at *6 (citation omitted); *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 184 (N.D.N.Y. 2013). Also noteworthy, a GAF score generally assesses the claimant's level of functioning "at the time of the evaluation" only. *DSM-IV* at 30.

## Conclusion

For these reasons, the Court DENIES Plaintiff's motion (Doc. 15), GRANTS the Commissioner's motion (Doc. 17), and AFFIRMS the decision of the Commissioner. The Clerk shall enter judgment on behalf of the Commissioner.

Dated at Burlington, in the District of Vermont, this 14th day of November 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge